**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| MICHELE RAYNER-ALTENBERND, | ) | |
| Derivatively on Behalf of Nominal Defendant | ) | |
| ROCKET COMPANIES, INC., | ) | |
| | ) | Case No. 2:23-cv-11207 |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| DANIEL GILBERT, JAY FARNER, | ) | |
| JENNIFER GILBERT, MATTHEW RIZIK, | ) | |
| SUZANNE SHANK, NANCY TELLEM, and | ) | |
| JONATHAN MARINER | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROCKET COMPANIES, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Michele Rayner-Altenbernd ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Rocket Companies, Inc. ("Rocket" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding

Rocket, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Rocket against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least February 9, 2021, and May 5, 2021, inclusive (the "Relevant Period") as set forth below.

2.      Rocket is an online mortgage origination company which sells mortgage loans to consumers through two primary segments: its Direct to Consumer ("DTC") channel and its Partner Network channel. Through its DTC segment, the Company issues loans to consumers who have contacted Rocket directly through its sales team, website, or mobile application. In contrast, loans in the Company's Partner Network arise out of referrals from third party brokers with whom Rocket must share profits. Accordingly, the DTC channel is significantly more profitable for the Company.

3.      Loans issued by Rocket can be further categorized as either refinancing loans or new purchase loans. Historically, the majority of the Company's loans have been refinancing loans, which accounted for 80% of Rocket's new loan applications in 2020. Refinancing loans are particularly sensitive to changing interest rates, as homeowners are generally induced to seek refinancing when interest rates fall.

4.      Rocket typically sells the loans that it issues to other entities who then package the loans and resell them on the secondary market as mortgage-backed securities ("MBS"). Rocket sells the loans to these entities at a price determined in part by what is known as the "primary-secondary spread," which refers to the difference between the mortgage interest rate for borrowers and yields on newly issued MBS. Accordingly, a higher primary-secondary spread

is a key indicator of higher profitability for Rocket.

5.      Throughout the Relevant Period, Individual Defendants (defined below) issued several false and misleading statements indicating that the Company was seeing "strong consumer demand" and that rising interest rates would not impact its mortgage business, despite their knowledge that starting in November 2020, the total demand for loans began to decline, and the Company's less profitable Partner Network began accounting for a higher proportion of the Company's loans. Further, beginning in February 2021, rising interest rates began to adversely impact the Company's profitability and sales by compressing the primary-secondary spread and reducing the demand for refinancing loans.

6.      At a Board meeting on March 23, 2021, Defendant Daniel Gilbert, the founder, majority shareholder, and former Chief Executive Officer ("CEO") of Rocket, was presented with disappointing internal financial forecasts, including a decrease in almost a billion dollars of revenue for the year and a significant decline in Gain on Sale margin, a key measure of the Company's profitability.

7.      Just six days later, on March 29, 2021, while in possession of this material non-public information, Defendant Daniel Gilbert, through a holding company, sold 20.2 million shares of Company stock for proceeds of approximately $500 million.

8.      On May 5, 2021, the Company stunned the market when it announced its guidance for the second quarter of 2021. Specifically, Rocket's reported loan volume guidance reflected a decrease of roughly $18.5 billion from the Company's actual results in the first quarter of 2021, and Rocket's reported Gain on Sale Margin guidance reflected a roughly 293 basis point decline year-over-year.

9.      On this news, the price of Company stock declined approximately 17% to close at

$19.01 on May 6, 2021 before hitting a low of $16.48 per share on May 11, 2021.

10.     As a result of the foregoing, a securities class action was filed against Rocket, Rock Holdings, Inc., and certain officers and members of the Company's Board, captioned *Shupe v. Rocket Companies, Inc., et al.,* Case No. 1:21-cv-11528-TLL-APP (E. D. Mich.) (the "Securities Action).

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b)of the Exchange Act (15 U.S.C. §§ 78j(b) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Rocket is headquartered in this Judicial District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this Judicial District.

## PARTIES

16.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Rocket common stock.

17.     Nominal Defendant Rocket is a Delaware corporation and maintains its principal executive offices at 1050 Woodward Avenue, Detroit, Michigan 48226. Rocket's common stock is traded on the NYSE under the ticker symbol "RKT."

18.     Defendant Daniel Gilbert has served as a member of the Board of Rocket since March 2020, and he serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. He is the Founder and former Chief Executive Officer ("CEO") of Rocket. Defendant Daniel Gilbert is also the Founder and Chairman of Rocket Mortgage, the Company's flagship business, and he served as CEO of Rocket Mortgage from 1985 until 2002. At all relevant times, he has served as Chairman and majority owner of Rock Holdings, Inc. ("RHI"), Rocket's majority shareholder, and he was appointed as CEO and President of RHI in March 2023. At all relevant times, Defendant Daniel Gilbert was the majority shareholder of Rocket through his holdings in and control over RHI. Defendant Daniel Gilbert signed the Registration Statement (defined below) issued in connection with the Company's August 2020 initial public offering ("IPO").

19.     Defendant Jay Farner ("Farner") served as a member of the Board of the Company from March 2020 until February 8, 2023. At all relevant times, Defendant Farner has served as CEO and Vice Chairman of Rocket. He also serves as CEO of Rocket Mortgage, and he served as CEO of Rock Holdings throughout the Relevant Period. According to the Company's public filings, Farner received $51,727,166 in 2020 and $1,603,475 in 2021 in compensation from the Company.

20.     Defendant Jennifer Gilbert has served as a member of the Board of the Company since March 2020, and she is the wife of Defendant Daniel Gilbert. Defendant Jennifer Gilbert signed the Registration Statement issued in connection with the Company's IPO.

21.     Defendant Matthew Rizik ("Rizik") has served as a member of the Board of the Company since March 2020, and he serves as a member of the Audit Committee, as Chair of the Compensation Committee, and as Chair of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Rizik received $346,000 in 2021 in compensation from the Company.  Defendant Rizik signed the Registration Statement issued in connection with the Company's IPO.

22.     Defendant Suzanne Shank ("Shank") has served as a member of the Board of the Company since August 2020, and she serves as a member of the Audit Committee. According to the Company's public filings, Defendant Shank received $252,552 in 2021 in compensation from the Company.

23.     Defendant Nancy Tellem ("Tellem") has served as a member of the Board of the Company since August 2020, and she serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Tellem received $258,552 in 2021 in compensation from the Company.

24.     Defendant Jonathan Mariner ("Mariner") has served as a member of the Board of the Company since November 2020, and he serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Mariner received $201,584 in 2021 in compensation from the Company.

25.     The defendants identified in ¶¶ 18-24 above are collectively referred to herein as the "Individual Defendants."

*Non-Party Confidential Witnesses*

26.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents, as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Action, which contains detailed allegations based on interviews with former Rocket employees (referred to herein as FEs 1-4) who provided information to plaintiffs' counsel in the Securities Action on a confidential basis and was described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27.    By reason of their positions as officers and/or directors of Rocket, and because of their ability to control the business and corporate affairs of Rocket, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rocket in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Rocket and its shareholders.

28.    Each director and officer of the Company owes to Rocket and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rocket, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Rocket, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

32.     To discharge their duties, the officers and directors of Rocket were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Rocket were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Michigan and the United States, and pursuant to Rocket's own Code of Conduct and Business Ethics;

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Rocket conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Rocket and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rocket's operations would comply with all applicable laws and Rocket's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(vii)   Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33.     At all times relevant hereto, the Individual Defendants were the agents of each

other and of Rocket and were at all times acting within the course and scope of such agency.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and waste of corporate assets.

36.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

37.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of Rocket, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

39.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Rocket and at all times acted within the course and scope of such agency.

## ROCKET'S CODE OF BUSINESS CONDUCT AND ETHICS

40.    Rocket's Code of Conduct and Ethics (the "Code of Conduct"), effective December 22, 2020, begins with an introduction stating, in relevant part:

> The Company's reputation for honesty and integrity is key to the success of its business. The Company intends that its business practices will comply with the laws of all of the jurisdictions in which it operates and that honesty, integrity, and accountability will always characterize the Company's business activity. No team member, officer, or director may achieve results through violations of laws or regulations or unscrupulous dealings.
>
> This Code reflects the Company's commitment to this culture of honesty, integrity, and accountability and outlines the basic principles and policies with which all team members, officers, and directors are expected to comply. Therefore, we expect you to read this Code thoroughly and carefully.

41.    The Code of Conduct expressly applies to each of the Company's "team members, officers and directors."

42.    With respect to financial reporting and public disclosure, the Code of Conduct states, in relevant part:

> Full, fair, accurate, and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its shareholders.
>
> Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:

- All accounting records, and the reports produced from such records, must comply with all applicable laws;

- All accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;

- All accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses; [and]

- Accounting records must not contain any false or intentionally misleading entries

43.     In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states, in relevant part, that "[a]ll team members, officers, and directors should promote and ensure the efficient and responsible use of the Company's assets and resources by the Company."

44.     With respect to insider trading, the Code of Conduct states, in relevant part: "[i]nsider trading is unethical and illegal. Team members, officers, and directors must not trade in securities of a company while in possession of material non-public information regarding that company."

45.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part:

All team members, officers, and directors must respect and obey the laws of the cities, states, and countries in which the Company operates and avoid even the appearance of impropriety. Team members, officers, or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

## ROCKET'S AUDIT COMMITTEE CHARTER

46.     Rocket's Audit Committee Charter states that the purpose of the Audit Committee is to oversee, among other things:

(a) the reliability and integrity of the Company's accounting policies, financial statements and other financial information provided by the Company to its

shareholders, the public, any stock exchange and others;

(b) the Company's compliance with legal and regulatory requirements;

(c) the qualifications and independence of the Company's independent auditor; [and]

(d) the performance of the Company's internal audit function and its system of internal controls and independent auditor"

47.     In a subsection titled "With respect to the Company's financial statements and other financial reporting," the Audit Committee Charter states that that Audit Committee shall:

Review and discuss with management the Company's earnings press releases, including the use of non-GAAP financial measures and other "pro forma" or "adjusted" presentations, as well as financial information and earnings guidance provided to analysts and rating agencies . . . [and] review and discuss with management, including the Company's disclosure committee, and the internal audit group the Company's major financial risk exposures and management's risk assessment and risk management policies.

48.     In a subsection titled "With respect to the internal audit function and internal controls," the Audit Committee Charter states that the Audit Committee shall "review the adequacy of the Company's internal control over financial reporting, disclosure processes, and its procedures designed to ensure compliance with laws and regulations."

49.     The Audit Committee Charter further states that the Audit Committee will "[m]onitor compliance with the Company's Code of Conduct and Ethics."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

50.     Rocket is a financial technology company that specializes in mortgage lending. The Company is incorporated in Delaware, and it maintains its principal executive offices in Detroit, Michigan.

51.     Rocket was originally founded in 1985 by Defendant Daniel Gilbert as a traditional mortgage lender. In 1999, the Company created a branch-based lender website which

allowed for a simpler and more transparent mortgage process. The success of the Company's website transformed Rocket into a market leader in the lending industry and led to the Company's expansion into a range of other financial services, including personal loans and credit cards.

52.     In 2015, Rocket launched Rocket Mortgage, its flagship business, which allows customers to secure mortgage loans through the Company's website or its proprietary mobile application. The Company's annual report on Form 10-K, filed with the SEC on March 24, 2021 (the "March 24, 2021 10-K"), stated the following with respect to Rocket Mortgage:

> The nation's largest mortgage lender, providing what we believe is the simplest and most convenient way to get a mortgage. Our digital solution utilizes automated data retrieval and advanced underwriting technology to deliver fast, tailored solutions to the palm of a client's hand. Our clients leverage the Rocket Mortgage app to apply for mortgages, interact with our team members, upload documents, e-sign documents, receive statements, and complete monthly payments.

53.     By the first quarter of 2020, Rocket had captured 9.2% of the over $2 trillion annual market, becoming the largest mortgage originator in the country.

54.     In August 2020, Rocket went public via the IPO, raising $1.8 billion. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RKT."

55.     Rocket primarily generates revenue through originating mortgage loans and then selling those loans in the secondary market. As reflected in the graph below, the Company's net revenue from the sale of loans in the secondary market, referred to as the "gain on sale of loans, net," constituted more than 85% of Rocket's total revenues over the last five years:



56.     Accordingly, the Company's "gain on sale of loans, net" figure is a key metric for evaluating the status of the Company's business. Indeed, in the March 24, 2021 10-K, the Company stated that Rocket's "mortgage origination business primarily generates revenue and cash flow from the gain on sale of loans, net. The gain on sale of loans, net includes all components related to the origination and sale of mortgage loans[.]"

57.     The Company also closely tracks its "Gain on Sale margin," which, according to the March 24, 2021 10-K, "is a measure of profitability for [Rocket's] on-going mortgage business."

58.     The Company's loans can be categorized as either home purchase loans (*i.e.*, loans offered to clients to purchase a new home) or home refinance loans (*i.e.*, loans offered to clients to pay off an existing, higher-interest loan). As detailed in the Amended Complaint, the vast majority of Rocket's loan originations are refinance loans:



59.     After issuing a loan, the Company typically sells that loan in the secondary market, usually to government sponsored enterprises ("GSEs"), such as Fannie Mae and Freddie Mac. The loans that GSEs purchase from mortgage originators like Rocket are then aggregated and sold as mortgage-backed securities ("MBS") to investors.

60.     The purchaser of an MBS receives an aggregate of the payments associated with the underlying mortgages. The average interest rate of the underlying mortgages is referred to as the coupon rate of the MBS, and the relationship between the coupon rate and the price of the MBS is referred to as the MBS "yield."  As detailed in the Amended Complaint, MBS yields are closely linked to the historical 10-year Treasury yield. The graph below demonstrates the high correlation between mortgage interest rates and the 10-year Treasury yield over the last decade:



61.     Rocket issues mortgage loans via two primary segments: its Direct-to-Consumer segment ("DTC"), whereby the Company issues loans to customers who have contacted Rocket directly through its website, mobile app, or sales team; and its Partner Network, whereby the Company acquires customers through referrals from mortgage brokers or third parties. The DTC segment is often referred to as the "Retail" business, and the Partner Network segment is often referred to as the "Wholesale" or the "Broker" business.

62.     The DTC segment typically has higher Gain on Sale margins than the Partner Network segment because profits generated in the Partner Network segment must be shared with the third parties who refer the loans to Rocket. The higher Gain on Sale margins in the DTC segment is demonstrated by the following graph pulled from the Company's public filings:



63.     The DTC segment further accounted for a significantly higher closed loan volume than the Partner Network. The closed loan volume refers to the unpaid principal of the loans issued by the Company. As displayed below, in the first quarter of 2019, the DTC segment accounted for $15.4 billion of closed loan volume, more than double the volume in the Partner Network:



64.     As the DTC segment has accounted for greater volumes of loans at higher Gain

on Sale margins, the DTC segment has generated the vast majority of Rocket's revenues, as

demonstrated below:



*Rocket's Key Performance Indicators*

65.     In Rocket's July 28, 2020, Form S-1 Registration Statement filed in connection

with the Company's IPO (the "Registration Statement"), signed by Defendants Daniel Gilbert,

Jennifer Gilbert, Jay Farner, and Matthew Rizik, Defendants assured potential investors that they

closely "monitor[ed]" Key Performance Indicators ("KPIs"), including "Loan Production" KPIs.

Defendants reiterated this statement in every subsequent quarterly and yearly report filed by the

Company throughout the Relevant Period.

66.     The "Loan Production" KPIs included three important metrics: (i) Gain on Sale

margins; (ii) Closed Loan Origination Volume, which the Company tracked for both its DTC and

Partner Network segments; and (iii) Total Market Share.

67.     Rocket's public filings demonstrate that the Company closely tracked these important Loan Production KPIs, consistently reporting on the three metrics both on a yearly and a quarterly basis.

68.     The Company explained in the Registration Statement that closely monitoring and analyzing Gain on Sale margins, Closed Loan Origination Volume, and Total Market Share allow Rocket to forecast gain on sale revenue: "We monitor a number of key performance indicators to evaluate the performance of our business operations. Our loan production key performance indicators enable us to monitor our ability to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market."

69.     In the Registration Statement, the Company attributed increases in total revenue, net revenue and net income for the three months ended June 30, 2020, to the increase in gain on sale margin.  According to the Registration Statement:

> Gain on sale margin increased from 3.25% for the three-months ended March 31, 2020 to a preliminary range of 5.10% to 5.25% for the three-months ended June 30, 2020. We believe that the elevated level of gain on sale margin experienced during the second quarter of 2020 was impacted by generally favorable market conditions and the low interest rate environment which led to increased demand for mortgages and capacity constraints in the industry. Increased rate lock volume noted above also contributed to our improved performance. ***As of the date of this prospectus, we have seen the favorable market conditions continue which has led to continued strong demand and origination volume.***[1]

70.     FE 1 was an Associate Business Analyst at Rocket Loans/Quicken Loans from November 2019 until June 2021 and Business Metrics Analyst from June 2021 until November 2021. FE 1 was primarily responsible for tracking the duration of the loan process, analyzing the amount of time it took to go from applications to closed loans.

71.     FE 1 confirmed that Rocket management tracked the Company's Gain on Sale margin even beyond the quarterly basis when they reported these metrics. According to FE 1,

---

[1] Unless indicated otherwise, all emphasis is added in this Complaint.

Defendants monitored the Gain on Sale margin during the quarter on a constant basis, tracking it "daily," if not "at least four times a week." Further, FE 1 stated that Rocket set "monthly" forecasts for Gain on Sale margins that were approved by the executives of the Company.

72.     FE 1 further recalled that senior executives and Company management had access to a "dashboard," or a software program that tracked the Gain on Sale margin, closed loan volume, and other metrics. FE 1 explained that the Company inputted and maintained a vast amount of information relevant to its business in what was referred to as its "data warehouse," and that the Company utilized a program known as "Sequel" to automatically populate the dashboard on the backend with data from the warehouse.

73.     Accordingly, given Defendants' constant tracking of these Loan Production KPIs, it was evident to Defendants by the end of 2020 that the Gain of Sale margin had peaked in the second quarter of 2020 and had been steadily declining:

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the Quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 4Q 2019 | 3.41% | $50.8 billion | $31.4 billion | $19.4 billion |
| 1Q 2020 | 3.25% | $51.7 billion | $31.7 billion | $20 billion |
| 2Q 2020 | 5.19% | $72.3 billion | $45.8 billion | $26.5 billion |
| 3Q 2020 | 4.52% | $89 billion | $54.6 billion | $34.4 billion |
| 4Q 2020 | 4.41% | $107.2 billion | $68.4 billion | $38.8 billion |
| 1Q 2021 | 3.74% | $103.5 billion | $61.4 billion | $42.1 billion |
| 2Q 2021 | 2.78% | $83.7 billion | $45.2 billion | $38.5 billion |

74.     In addition to closely monitoring the Loan Production KPIs, Defendants also tracked every step in the loan process. When potential clients visit Rocket's website or mobile application, they are prompted to provide Rocket with information including:

(1) Type of Loan: Home Refinance, Home Purchase, or Cash-Out Refinance;
(2) Home Description: Single-Family, Multifamily, Condominium, or townhouse;
(3) Property Use: Primary Residence, Secondary Home, or Investment Property;

(4) Expected Timeline: Signed a Purchase Agreement, Offer Pending, Found a House, Buying in 30 Days, Buying in 2 to 3 Months, Buying in 4 to 5 Months, Buying in 6+ Months, or Researching Options;

(5) First-time home buyer: Yes or No;

(6) Credit Profile: 720+, 660-719, 620-659, 580-619, or Below 580;

(7) Name: First and Last;

(8) Email Address; and

(9) Password to establish an account with Rocket.

75.     After providing the above information, the potential client can proceed to "Start a New Application" online. Thus, the Company collects a large amount of data about its potential clients and the characteristics of a potential loan before a loan application even begins.

76.     Further, prior to and throughout the Relevant Period, the Company tracked and analyzed internet traffic to Rocket's website(s). As explained in the Company's public filings, including the March 24, 2021 10-K which was signed by each of the Individual Defendants:

> We monitor a number of key performance indicators to evaluate the performance of our business operations. Our loan production key performance indicators enable us to monitor our ability to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market . . . *We also include Rockethomes.com average unique monthly visits, as we believe traffic on the site is an indicator of consumer interest.*

77.     Additionally, Rocket used its subsidiary "Core Digital Media" to track consumer interest and predict the likely volume of new loans. As explained in the Registration Statement:

> Core Digital Media is an online marketing and lead generation service provider in the mortgage, insurance and education sectors. *Core Digital Media is a generator, buyer and seller of leads for third parties and for Rocket Mortgage*. Core Digital Media owns and operates several marketing platforms, including "LowerMyBills.com," that connect clients with providers of home loans, auto loans, personal loans, and auto, life and home insurance. Acquired in 2017, *Core Digital Media has become an important component of our performance marketing strategy*. Core Digital Media enables growth for our broader ecosystem by *offering unique insight into the lead generation market* and allows us to introduce innovative marketing programs designed to increase the conversion rates for online leads.
>
> Core Digital Media generated over six million client leads for mortgage and other industries in 2019. *Core Digital Media's unique ability to consistently generate*

***high quality leads***, coupled with Rocket Mortgage's superior client experience, ***has driven higher conversion rates and has aided our market share growth in Rocket Mortgage***. We also leverage Core Digital Media's capabilities in cross-marketing our products and services to clients across our ecosystem.

78.     Accordingly, Rocket has a wealth of information with respect to potential new loan applications and the likely volume of new loans. Indeed, during the Relevant Period, the Company touted its ability to use proprietary machine learning software to parse through its vast "data lake" of information—which pertains to a staggering 85% of the United States population—to anticipate market conditions and predict future loan volume in "real-time." During the fourth quarter 2020 earnings call on February 25, 2021, Defendant Jay Farner stated:

Along with our powerful Rocket Cloud Force, our company also continues to rapidly grow its use of ethical, artificial intelligence and machine learning to streamline the business. This acceleration is made possible, thanks to ***our vast data lake, which includes proprietary first- party data on more than 58 million consumers and extends to 220 million consumers in total or 85% of the adults in the United States***. We have the benefit of millions of clients working with us each year to buy a car, get a personal loan, buy a home or refinance a mortgage, and ***we've been able to leverage this information to build sophisticated models*** to ensure our brand is in front of our clients and top of mind when they're ready to transact. In fact, since the beginning of 2019, ***data science has driven more than $75 billion in application volume***. ***The importance of data cannot be overstated. It is this information that allows us to quickly innovate, anticipate the market and, in some cases, develop new companies all together. These real-time insights are a significant market advantage and consistently guide us to the right decisions*** with incredible efficiency. Together, these pillars of our business: our scalable platform, our national brand, our Rocket Cloud Force and our strategic use of data, combine to create a technology powerhouse that continues to accelerate at scale.

79.     The Company further stated in its Press Release for the fourth quarter of 2020:

The Rocket Companies platform generated 153 million unique visitors in 2020, a 61% increase from 2019. Our vast data lake includes proprietary first-party data on more than 58 million consumers and extends to 220 million consumers in total or 85% of the population of adults in the United States. [] Using our data science capabilities and leveraging our data lake, we recently crossed an important milestone, generating more than $75 billion in application volume over the past two years.

80.     In its Registration Statement, Rocket promoted its ability to forecast future

transactions by tracking "every step" of the loan process:

> *Data Analytics*
>
> We have access to client financial information and needs which allows us to more effectively understand and market to our clients. ***Both through lead acquisition and servicing, we aggregate this information on*** current and ***potential clients***. For example, knowing the details of a client's existing mortgage ***allows us to execute a real-time marketing campaign to targeted clients when mortgage rates drop. We also have the ability to predict*** . . . ***when a family may be looking to buy a new home and will potentially need a purchase mortgage***.
>
> The scale and design of ***our model allows us to gather insights into and improve the client experience through measuring and recording each step in the process. We track, test and refine every step of the client journey*** and our users' experience. ***This allows us to intelligently manage our funnel of potential clients, drive conversion*** and continuously identify areas of potential improvement. Our scale has enabled us to experiment with various approaches to these tasks and constantly tune our strategies for user satisfaction.

81.     The Registration Statement further touted the Company's ability to track loan

applications and activity on its website with remarkable specificity:

> ***With advanced analytics tools, we are often able to foresee potential issues before they arise***, further supporting uninterrupted client experience, business growth and operational efficiency.
>
> Our software is designed with scalability in mind to manage a large quantity of loans. On average, we currently process more than ***6,200 client applications each day, and over 8,100 applications are started each day via our website, mobile app and mobile web. A sign-in to Rocket Mortgage occurs every half second from clients who are applying for a mortgage, have a mortgage in process, or accessing their loan servicing. Every 26 seconds a mortgage application is completed and ready for underwriting.*** The versatility and scalability of our technology provide a solid foundation for our continued growth.

82.     During the Company's first quarter 2021 Earnings Call, Defendant Jay Farner

stated:

> As we develop industry-leading technologies that create better outcomes for our clients, we are also continuing to improve and evolve how we leverage the tremendous insights we can glean from our centralized integrated data lake. ***This***

*data lake and its 220 million consumer records is a strategic moat for the Rocket platform.* Leveraging this resource in the first quarter, we significantly expanded our data marketplace, an internal API platform that allows our teams to develop new applications, run marketing campaigns and even build new business lines, *all using common, trusted and secured data assets. Machine learning and AI continue to play an increasingly important role in our organization as well. Every single day,* our systems make nearly 8.5 million automated decisions, helping to ensure we are running the business.

83.     During the same call, Defendant Jay Farner further touted the predictive capacity

of the Company's models:

*I think we're very well positioned and this goes back to our data science team. We have 220 million records. We talk to millions of people a month,* understanding their debt load. *We can model out where they were a year ago and then also model out where they will be in the future,* creating all kinds of opportunity to balance out the equity in their home, with the debt that they're building and we can consolidate that. *That's a huge piece of our business. We've been executing on that for years.*

84.     Thus, Defendant Jay Farner acknowledged that Rocket could "model out where

[consumers] will be in the future," and therefore Defendants had the ability to forecast key

metrics about the business with the use of the Company's massive database. Indeed, in Rocket's

Registration Statement, the Company further touted to investors its ability to "foresee potential

issues before they arise":

*With advanced analytics tools, we are often able to foresee potential issues before they arise,* further supporting uninterrupted client experience, business growth and operational efficiency.

Our software is designed with scalability in mind to manage a large quantity of loans. On average, we currently process more than *6,200 client applications each day, and over 8,100 applications are started each day via our website, mobile app and mobile web. A sign-in to Rocket Mortgage occurs every half second from clients who are applying for a mortgage, have a mortgage in process, or accessing their loan servicing. Every 26 seconds a mortgage application is completed and ready for underwriting.* The versatility and scalability of our technology provide a solid foundation for our continued growth.

85.     FE 2, a Senior Director Product Manager at Rocket from May 2020 until May 2021 responsible for certain aspects of the user interface on the Company's website, confirmed that Rocket could forecast future loans based on web traffic. FE 2 stated that the "predictive analysis" begins "early on" in the loan process and that the Company would continue to gather both proprietary and publicly available information throughout the process. FE 2 further explained that Rocket could accurately predict which loans were likely to close and which were not and that these predictions would update and become more accurate as more information became available throughout the process.

86.     FE 3 was an Account Executive who worked on the "Wholesale" (Partner Network) side of Rocket's business, building relationships with, training, and interfacing with broker partners to encourage the use of Rocket's platform. FE 3 further confirmed that "every stage of the loan approval process" was tracked, including the initial application, the registration, and various status updates throughout the process, and that "top people" at the Company could access the information.

87.     Rocket states on its website that it takes roughly 45 to 60 days from the time a new loan application starts to when the loan closes. Its website further indicates that "standard mortgage loans take an average of 49 days, while FHA loans, with the longest average time, take 54 days, according to Ellie Mae."

88.     Accordingly, given the Company's massive database and predictive capabilities, Defendants knew or should have known Rocket's likely upcoming closed loan volume roughly 45 to 60 days prior to those trends manifesting in the Company's financial results. As Defendant Jay Farner admitted in the Company's fourth quarter 2021 earnings call, even pre-application

information, such as website visits and downloads of the Rocket Mortgage app, served as indicators for gain on sale and closed loan volume forecasts:

> **Q** (JPMorgan & Chase Analyst): ***When we look at the guidance on gain on sale for the first quarter***, how should we think about that in context of -- primary, secondary spreads have come in pretty significantly. But also, and this is the, I think, the more interesting nuance point, how are you thinking about your pipeline hedge and potentially an [inverse] a decrease in fallout with the [splicing rates]?

> **A** (Defendant Jay Farner): Yes. Great question. I can tell you that those type of things are what our capital markets folks are looking at every day and the data that we have, ***and I'm going to go back to the importance of the data from the top of the funnel, even pre- application to understand pull-through rates. And so those type of data points are priced in to the guidance that Julie's provided***.

***By November 2020, Both the Amount of New Loan Applications and Rocket's Closed Loan Volume Had Begun to Decline***

89.     Rocket uses its subsidiary, Core Digital Media to track consumer interest and forecast future loan volume. By the second quarter of 2020, the number of client inquiries generated by Core Digital Media had begun declining. As detailed in the Amended Complaint, compared with client inquiries generated in the first quarter of 2020, client inquiries in the third quarter of 2020 had declined by more than 20%:



90.     This reduction in leads put Defendants on notice that there would be fewer loan applications in the fourth quarter of 2020, and thus, fewer closed loans in the fourth quarter of 2020 and the first quarter of 2021.

91.     Furthermore, by the second half of 2020, Rocket's net rate lock volume, another key indicator of future closed loan volume, had flattened, and it began to decline by the first quarter of 2021. As explained in Rocket's Registration Statement, the Company enters into "agreements to lend to a client as long as there is no violation of any condition established in the contract," referred to as interest rate locks ("IRLCs"). The net rate lock volume refers to the unpaid principal balance of all loans subject to IRLCs, reduced by a "pull-through factor," a variable used by the Company to capture the percentage of IRLCs which actually result in a closed loan.

92.     The following graph, included in Rocket's public filings, demonstrates that in the third and fourth quarters of 2020, net rate lock volume flattened, and it declined throughout the first half of 2021:



93.     Quarter-over quarter *growth* for net rate lock, however, had actually been declining since the second quarter of 2020:



94.     Given the reduction in client interest and the stagnant net rate lock volume in the second half of 2020, Defendants knew that the Company's closed loan volume would decline in the fourth quarter of 2020 and the first half of 2021.

95.     Indeed, as detailed in the Amended Complaint and demonstrated by the following graph, total closed loan volume had begun to decline in November 2020:



96.     Furthermore, closed loan volume for both the Retail (DTC) and Broker (Partner Network) segments of the Company's business had begun to decline by November 2020:



| Date | Retail Channel ($ Thousands) | Broker Channel ($ Thousands) |
|---|---|---|
| Sep-19 | 8,857,456 | 3,972,872 |
| Oct-19 | 10,825,250 | 5,015,676 |
| Nov-19 | 11,047,426 | 5,035,485 |
| Dec-19 | 11,439,756 | 4,541,259 |
| Jan-20 | 9,441,627 | 4,161,202 |
| Feb-20 | 9,022,179 | 3,973,944 |
| Mar-20 | 10,847,597 | 6,053,123 |
| Apr-20 | 13,829,313 | 6,548,025 |
| May-20 | 13,846,219 | 5,030,748 |
| Jun-20 | 18,691,138 | 7,349,675 |
| Jul-20 | 17,671,387 | 8,273,177 |
| Aug-20 | 20,247,244 | 9,187,134 |
| Sep-20 | 18,485,851 | 8,980,657 |
| Oct-20 | 22,439,103 | 11,051,740 |
| Nov-20 | 27,681,273 | 12,566,502 |
| Dec-20 | 22,413,988 | 10,007,541 |
| Jan-21 | 22,216,385 | 9,849,362 |
| Feb-21 | 21,716,850 | 11,556,967 |
| Mar-21 | 21,747,955 | 11,407,178 |
| Apr-21 | 20,903,202 | 10,468,444 |
| May-21 | 14,464,014 | 7,895,238 |
| Jun-21 | 15,335,190 | 8,974,004 |
| Jul-21 | 13,768,499 | 8,164,059 |

97.     Importantly, while closed loan volume declined for both segments, the Company's DTC segment declined more significantly. Accordingly, Rocket's less profitable Partner Network began accounting for a greater share of the Company's loans, from only 36% in the fourth quarter of 2020 to 41% in the first quarter of 2021 and 46% in the second quarter of 2021:

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 3Q2020 | 4.52% | $89 billion | $54.6 billion | $34.4 billion |
| 4Q 2020 | 4.41% | $107.2 billion | $68.4 billion | $38.8 billion |

| 1Q 2021 | 3.74% | $103.5 billion | $61.4 billion | $42.1 billion |
| 2Q 2021 | 2.78% | $83.7 billion | $45.2 billion | $38.5 billion |

98.     While the Company reported quarterly closed loan volume and quarterly closed loan volume by segment, it failed to disclose closed loan volume on a monthly basis. However, Defendants certainly had access to this information, as Defendants acknowledge that the Company closely monitored closed loan volume as a Loan Production KPI, broken down by each channel (i.e., DTC and the Partner Network).

***Rising Interest Rates Further Impacted the Company's Closed Loan Volume***

99.     As referenced earlier, in paragraph 57, Rocket issued loans for refinancing as well as for new purchases. Between December 2020 and March 2021, refinancing accounted for roughly 90% of Rocket's originated loans. This is significant because refinancing volume is highly impacted by interest rates. As detailed in the Amended Complaint, homeowners tend to take advantage of declining interest rates by refinancing. Conversely, as interest rates rise, refinancing volume tends to decrease:[2]

---

[2] This graph reflects Refinance Origination Volume in the mortgage industry compared to the Mortgage Interest Rate, concerning Fixed Rate Mortgages in Fannie Mae, Freddie Mac, and Ginnie Mae Single Family Programs.



100.    As the Company's primary source of mortgage originations was in the refinancing sector, rising interest rates had the potential to seriously impact Rocket's consumer demand. Indeed, while refinancing accounted for roughly 90% of Rocket's originated loans between December 2020 and March 2021, its share of the Company's loans declined to 79% in May, corresponding with the increasing interest rate environment.

101.    As further detailed in the Amended Complaint, rising interest rates also impact the profitability of mortgage originators like Rocket by compressing the primary-secondary spread, or the difference between mortgage rates for borrowers and yields on mortgage-backed securities. This is because the primary-secondary spread is a chief determinate of the price GSEs will pay mortgage originators for the loan. Indeed, Defendants acknowledged this when the Company announced downward guidance on Gain on Sale margins during its first quarter 2021 earnings call on May 5, 2021 (the "May 5, 2021 Earnings Call"):

If we look at that quarter-over-quarter change in the gain on sale margin guidance, it's really being driven kind of roughly by three *equal* factors: first of all, is changes in loan pricing and particularly our investment to drive the growth in the partner network channel; the *second thing is that we did see the primary-secondary spread compress at the end of Q1 and into Q2*; and then the third factor that I'll mention is the channel and the product mix.

102.     Moreover, in Rocket's 2020 Form 10-K, Defendants expressly recognized the

ways that Rocket's business is "directly affected" by interest rates:

Our financial performance is *directly affected* by changes in prevailing interest rates. . . . *We generally note that the refinance market experiences more significant fluctuations than the purchase market as a result of interest rate changes.* Long-term residential mortgage interest rates have been at or near record lows for an extended period, but they may increase in the future. As *interest rates rise, refinancing generally becomes a smaller portion of the market as fewer consumers are interest in refinancing their mortgages. . . . Higher interest rates may also reduce demand . . . increase or maintain our volume of mortgages. Decreases in interest rates can also adversely affect our financial condition, the value of our MSR portfolio and the results of operations*. With sustained low interest rates, as we have been experiencing, refinancing transactions decline over time, as many clients and potential clients have already taken advantage of the low interest rates. . . . Borrowings under our financing facilities are at variable rates of interest, which also expose us to interest rate risk. If interest rates increase, our debt service obligations on certain of our variable-rate indebtedness will also increase.

103.     As displayed below, interest rates for both the 30-year and the 15-year fixed rate

mortgage began to rise in early February 2021[3]:



___

[3] Source: *Mortgage Rates*, FreddieMac.com, https://www.freddiemac.com/pmms (Last visited June 3, 2022).



104.    The Amended Complaint also demonstrated the direct relationship, historically, between mortgage rates and the 10-year Treasury Yield. Accordingly, as rising mortgage rates can have the effect of compressing the primary-secondary spread, which can in turn reduce a mortgage originator's profitability, a rising 10-year rate can also serve as an indicator for reduced future profitability. The figures below demonstrate the correlation between mortgage rates and the 10-year rate and the fact that the 10-year rate had also been increasing in early 2021:





***The United Wholesale Ultimatum***

105.    On March 4, 2021, United Wholesale Mortgage ("UWM"), Rocket's largest

competitor in the mortgage loan origination industry, issued an ultimatum to mortgage brokers,

threatening massive fees against brokers who continued to work with Rocket. This forced brokers to choose between UWM and Rocket.

106.    FE 4 was a National Account Executive at Rocket/Rocket Pro TPO from August 2020 until May 2021 and as a Senior Credit Underwriter from May 2021 until July 2021. Immediately after the UWM ultimatum, FE 4 recalls calling his clients to try to save his business, but many mortgage brokers were very loyal to UWM. FE 6 explained that he lost roughly ten of his twenty five mortgage broker clients.

107.    In response to the ultimatum, Rocket began implemented undisclosed discounting programs. According to FE 4, after the ultimatum, Rocket began extending special discounts to all of its clients.

108.    FE 3 recalls Rocket's business being adversely impacted by the ultimatum. According to FE 3, he went from generating thirty to thirty five new loans per month prior to the ultimatum, to only five per month soon after the ultimatum.

109.    Despite Rocket's attempt to maintain its broker clients, Rocket's market share of loan volume originating with brokers declined significantly after the ultimatum. As demonstrated in the Amended Complaint, Rocket's market share of loans originating with brokers fell from 23.39% in February 2021 to just 18.69% in May 2021:



*Defendants' Materially False and Misleading Statements*

110.    In the Registration Statement, the Individual Defendants caused the Company to state that *"We believe that the elevated level of gain on sale margin experienced during the second quarter of 2020 was impacted by generally favorable market conditions and the low interest rate environment which led to increased demand for mortgages and capacity constraints in the industry. . . . **As of the date of this prospectus, we have seen the favorable market conditions continue which has led to continued strong demand and origination volume.**"* (Emphasis added).

111.    The Individual Defendants, however, intentionally or recklessly omitted from the Registration Statement that the Gain on Sale margin was declining during the third quarter 2020, and ultimately dropped from 5.19% at the end of the second quarter 2020 to 4.52% at the end of the third quarter 2020. In fact, the Gain on Sale margin would continue to decline throughout the Relevant Period, falling to 2.78% by the end of the second quarter 2021.

112.    In addition, throughout the Relevant Period, Individual Defendants issued false and misleading statements touting Rocket's business prospects while failing to disclose that: (i) the Company's Gain on Sale margin was decreasing; (ii) client applications were decreasing; (iii) Rocket's closed loan volume was decreasing; and (iv) rising interest rates were adversely impacting the Company's crucial refinancing business and profitability.

113.    On February 25, 2021, during an earnings call announcing Rocket's fourth quarter 2020 financial results and first quarter 2021 guidance, Defendant Farner responded to a question regarding the Company's growth strategy, stating: "*[w]e're seeing strong consumer demand,* especially in the housing market. I mean, *it's the strongest that it's been here in the last decade* . . . I'll draw your attention to the fact that overall, we were able to grow volume twice as fast as the industry in 2020."

114.    During the same earnings call, in response to a question about the impacts of rising interest rates on the Company's DTC and Partner Network segments, Defendant Farner claimed that rising interest rates would have no impact on Rocket's business:

> *And so, usually, as we see these interest rates tick up a bit,* what we're going to see is an opportunity for us to lean in to spend more money and now to talk about the retail or Direct-to-Consumer space, same situation here. There are so many marketing opportunities out there for us. And as others tend to step away or back away from the space, this is where we can lean in, we can grab market share. And not only are we thinking about the profitability that we achieved on the first transaction, we're thinking about the lifetime value of that client and we're now thinking about the lifetime value not only over mortgage, but real estate, auto, and these additional businesses that we'll be adding. So, I guess you can tell we're pretty excited about it and *don't see interest rates going up or down, really having an impact on our business one way or the other.*

115.    These statements were materially false and misleading and omitted material facts necessary to make the statements not misleading because they failed to disclose that: (i) internal Company data reflected diminishing consumer demand as web traffic and new loan applications

began declining in 2020 and continued through the first quarter 2021; (ii) net rate lock volumes were declining; (iii) after peaking in November 2020, Rocket's total closed loan volume began to decline, and the closed loan volume in both the Company's DTC segment and its Partner Network segment began to decline; (iv) in the first quarter of 2021 the Company experienced a significant shift whereby a higher percentage of its loans were generated by the less profitable Partner Network segment; and (v) Rocket's mortgage business was highly sensitive to rising interest rates because of the inverse relationship between interest rates and refinancing volume and because increased interest rates can reduce Gain on Sale margin and compress the primary-secondary spread, diminishing the Company's profitability. Further, when the Company announced its downward guidance for Gain on Sale margins during its May 5, 2021, Earnings Call, Defendants attributed the lowered expectations to the compressed primary-secondary spread, admitting that Rocket's business was adversely impacted by rising interest rates.

116.   On March 3, 2021, during an interview at the virtual Morgan Stanley TMT Conference, when asked about the Company's growth rate for each of its channels, Defendant Farner stated that all segments were growing, despite internal Company data indicating otherwise:

> So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can **probably sense from my passion**, **they're all growing.** And with what about less than 10% market share, wherever we are, it's hard to say today. If you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

117.   This statement was materially false and misleading because at the time of the statement, Rocket's total loan volume, as well as the loan volume in each of the Company's channels, had been declining for months since its peak in November 2020:



118.    On March 11, 2021, Fox Business broadcasted an interview with Defendant Farner during which Defendant Farner was asked about how the Company would be impacted by the pandemic winding down:

> Fox Business Representative: The pandemic is, I think, winding down. I'm not going to say it's over, but the effects of it are certainly winding down. Do you think that's good for Rocket Companies?
>
> Defendant Farner: "I do. You know, we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow. Our focus on our platform and our tech platform really allows us to be very efficient when we're underwriting, processing, and closing mortgages. And so as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share. And now, as we grow market share, not only are we capturing revenue with our mortgage, but title, real estate, auto, personal loans. So as we grow out all of those different services we're able to offer our clients that lifetime value of a client grows and grows for us. So, ***really, interest rates moving around are a great benefit to us***. And then, of course, when they drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money. So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."

119.   On May 19, 2021, in a Twitter post, Defendants Gilbert and Farner boasted that Rocket had increased its market share and its loan volume from third-party originators:



120.   These statements were materially false and misleading and omitted material facts necessary to make the statements not misleading because they failed to disclose that: (i) Rocket was highly sensitive to rising interest rates because of the inverse relationship between interest rates and refinancing volume and because increased interest rates can reduce Gain on Sale margin and compress the primary-secondary spread, diminishing the Company's profitability; (ii) at the time of the Twitter post, Rocket had lost a substantial amount of business as a result of the UWM ultimatum; (iii) in response to the UWM ultimatum, Rocket began offering special discounts in first quarter 2021; and (iv) Rocket's market share of the broker business declined immediately following the UWM ultimatum:



*The Truth Emerges*

121.   On May 5, 2021 after markets closed, Defendants issued a press release announcing its first quarter 2021 results. In the first quarter 2021 Earnings Release, Defendants reported that Rocket was substantially revising its second quarter 2021 guidance for gain on sale margin and closed loan volume downward.

122.   Specifically, the Company announced closed loan volume guidance of between $82.5 billion and $87.5 billion and Gain on Sale margin of 2.65% to 2.95%. The mid-point of the loan volume guidance range, $85 billion, represented a decline of $18.5 billion from the Company's first quarter 2021 actual closed loan volume, and the mid-point of the Gain on Sale margin range reflected a 239 basis point decline year-over-year, the Company's lowest post-IPO quarter Gain on Sale Margin ever reported.

123.   That same day, during the Company's first quarter 2021 earnings call, Defendants announced the Gain on Sale margins for each segment, reporting a decline in DTC margins to

around 4%, and a decline in Partner Network margins to around 1%. Defendants partially

attributed the decreased Gain on Sale Margin guidance to its previously undisclosed shift in

product mix to the lower margin Partner Network segment:

> Our combined second quarter gain on sale margin guidance of between 2.65%
> and 2.95% *reflects changes in channel and product mix, including continued*
> *strong growth in our partner network*, which drives attractive incremental
> profits.

124.    Defendants further revealed that the Company's growth would depend on new-

home purchase loans, as opposed to refinancing loans, as they are less sensitive to increasing

interest rates, an admission that Rocket was being adversely impacted by rising interest rates:

> *In our mortgage business, continuing to drive strong volume in 2021 will*
> *require addressing client needs that are less sensitive to interest rates.*
>
> Turning to the home buying opportunity specifically, as you heard from Jay,
> home purchase transactions represent the single largest growth opportunity for
> Rocket Companies today. In the first half of 2021, we are seeing strong
> acceleration in purchase activity at Rocket Mortgage.

125.    The Company further attributed Rocket's revised Gain on Sale Margin guidance

to the Company generating more loans in the Partner Network segment and the primary-

secondary spread compression:

> If we look at that quarter-over-quarter change in the gain on sale margin guidance, it's
> really being driven kind of roughly by three equal factors. First of all, is changes in loan
> pricing and particularly our investment to drive the growth in the partner network
> channel. The second thing is that we did see the primary secondary spread compress at
> the end of Q1 and into Q2. And then the third factor that I'll mention is the channel and
> the product mix.

126.    On this news, the price of Rocket Class A common stock declined nearly 17% to

close at $19.01 per share on May 6, 2021. As the market continued to digest the news, the price

of Rocket Class A common stock continued to fall, hitting $16.48 per share on May 11, 2021.

*Insider Trading*

127.    As detailed in the Amended Complaint, Rocket's Audit Committee met on March 10, 2021. At that meeting, the Audit Committee discussed: (i) the expected decline in Gain on Sale margin from 3.5% to 3.19%; (ii) the expected decrease in $950 million of revenue for the year; (iii) the expected decrease in refinancing volume for the year; and (iv) the expected compression of the primary-secondary spread. Defendant Jay Farner and other members of Rocket's management presented this information at a Board meeting on March 23, 2021 at which Defendant Daniel Gilbert was present.

128.    On March 19, 2021, RHI, which is wholly controlled by Defendant Daniel Gilbert delivered a notice of exchange ("Exchange Notice") to Rocket, pursuant to which RHI would have the option to sell up to 47 million Holding Units and shares of Class D stock for shares of Class B stock. The Class B shares would then be automatically converted into Class A shares that RHI could sell on the open market.

129.    At the time when RHI delivered the Exchange Notice, the trading window was closed pursuant to Rocket's Insider Trading Policy.

130.    With respect to the trading window, the Insider Trading Policy states:

Trading Window:

The Company imposes certain restrictions on specified senior officers, management, directors and team members, and their Related Parties when trading in Company securities. These restrictions govern even though the transactions may be permissible under law and apply to the following persons hereafter defined as the "Window Group":

- All members of the board of directors of the Company;
- All senior executives of the Company, meaning the Chief Executive Officer, the Chairman, the Chief Financial Officer, the President, their specific direct reports, and any other officer subject to Section J 6 of the Securities Exchange Act of 1934;

- Certain team members that are a part of accounting, finance and legal teams; and
- Any other team members designated by the General Counsel of Rocket Companies or a designee of the General Counsel as a member of the Window Group as such list may be updated from time to time.

The Company will conduct an evaluation each quarter to determine whether the scheduled trading window should be cancelled. The Company may close an open trading window or open a closed trading window early at any time, as deemed appropriate by the General Counsel or other members of senior management. The General Counsel of Rocket Companies or any designee of the General Counsel, in his or her own discretion, may from time to time remove one or more team members from the Window Group.

Notwithstanding transactions made subject to an approved 10b5- 1 trading plan, members of the Window Group and their household and immediate family members may only enter into transactions in Company securities (including option exercises and gifts) during an open trading window that commences one business day after the public release of the Company's quarterly or annual financial results and ends on the date two weeks before the end of each fiscal quarter. After the close of the trading window, the Window Group and their household and immediate family members may not purchase, sell or otherwise dispose of any of the Company's securities. The prohibition against trading while aware of, or tipping of, material non-public information applies even during an open trading window. For example, if during an open trading window you are aware that a material acquisition is pending, you may not trade in the Company's securities. You should consult the General Counsel of Rocket Companies or a designee of the General Counsel whenever you are in doubt.

The restrictions shall not apply with respect to a public offering of Company securities specifically authorized by board of directors or Rocket Companies or duly authorized board committee.

Pre-clearance of Trades: During a trading window, all directors and Section 16 Officers (as defined below) and their Related Parties must pre-clear all transactions in Company securities with the General Counsel of Rocket Companies or a designee of the General Counsel. ***Pre cleared transactions may only be performed during the trading window in which approval was granted and within two business days from the date of approval. If the transaction does not occur during the two-day period, pre-clearance of the transaction must be re-requested.***

Hardship Exemptions: In the event of exceptional personal hardship, a member of the Window Group may request a hardship exemption from the General Counsel of Rocket Companies or a designee of the General Counsel for permission to trade outside the trading window, if the person does not possess any material non-

public information and not otherwise prohibited from trading pursuant to this policy.

131.    Pursuant to the Insider Trading Policy, insiders were only permitted to trade in Rocket stock "one business day after the public release of the Company's quarterly or annual financial results" until "the date two weeks before the end of each fiscal quarter." Accordingly, the trading window had closed on March 17, two days prior to the Exchange Notice delivery, and it was expected to remain closed until May 2021. This timing suggests that the trades were executed in response to adverse material non-public information. Had Defendant Daniel Gilbert and RHI had a long-term plan in place to sell the stock, they likely would have traded during the open window to avoid having to request a clearance from the Company.

132.    Rocket's Insider Trading Policy permits the trading window to be opened at any time as "deemed appropriate by the General Counsel or other members of senior management." However, Rocket's management was conflicted due to the fact that it overlapped significantly with RHI's senior management (including Defendant Jay Farner who served as CEO of both companies), and RHI controlled Rocket as its majority shareholder. Thus, in the context of Defendant Daniel Gilbert executing a trade through RHI, the Insider Trading Policy was rendered effectively meaningless.

133.    As detailed in the Amended Complaint, Defendant Jay Farner attended an Audit Committee meeting on March 22, 2022. Despite the Audit Committee's acknowledgement at that meeting that "[t]he Company's trading window closed on March 17th and is not expected to open in the ordinary course until May 12th," the Audit Committee "voted unanimously to approve opening the trading window for a limited sale by RHI" after "discussions with Jay Farner" and other members of management.

134.    In other words, after discussion with Rocket's conflicted management, the Audit Committee decided to open the trading window, for the sole purpose of allowing Defendant Daniel Gilbert to offload his stock before the first quarter 2021 earnings announcement.

135.    On March 29, 2021, Defendant Daniel Gilbert, while in possession of the material non-public information revealed internally just six days earlier, sold $500 million of Company stock just prior to the disappointing first quarter 2021 Earnings Call. On March 31, 2021, the Company disclosed that Defendant Daniel Gilbert, through RHI, sold 20,200,000 shares of Rocket Class A common stock in a private sale at a price of $24.75 per share, for total proceeds of $499.95 million. Suspiciously, Defendant Daniel Gilbert had never publicly sold a single share of Company stock prior to this massive insider sale.

136.    At the time of the sale, Defendant Daniel Gilbert indisputably had knowledge of adverse material non-public information, including: (i) the expected decline in Gain on Sale margin from 3.5% to 3.19%; (ii) the expected decrease of almost a billion dollars of revenue for the year; (iii) the expected 80% decrease in refinancing volume for the year; and (iv) the expected compression of the primary-secondary spread. Indeed, Defendant Farner and others presented this information to Defendant Daniel Gilbert just six days before the trade.

137.    Accordingly, Defendant Daniel Gilbert's sale through RHI violated the Securities Exchange Act Section 10(b) as Defendant Daniel Gilbert breached his duty to disclose the material non-public information that he possessed before executing the trade on March 29, 2021 or refrain from trading.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

139.    Rocket is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

140.    Plaintiff is a current shareholder of Rocket and was a continuous shareholder of the Company from the IPO throughout the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

141.    At the time this action was commenced, the seven-member Board was comprised of Defendants Daniel Gilbert, Jennifer Gilbert, Rizik, Shank, Tellem, and Mariner, as well as Bill Emerson, who joined the board in February 2023. Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors, or if not all then at least six, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

142.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to

conceal those wrongs. The Individual Defendants authorized and/or permitted the issuance of various false and misleading statements, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

143.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Rocket, the Individual Defendants knew, or should have known, the material facts surrounding the declining demand for loans and the impacts that rising interest rates would have on the Company's business.

145.    Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

146.    Defendants Rizik, Shank, Tellem, and Mariner are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as

members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's financial condition and business prospects. Therefore, Defendants Rizik, Shank, Tellem, and Mariner cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

147.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Rocket's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

148.    Further, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

149.    The Individual Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the

directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct.  Thus, any demand on the current Board would be futile.

150.    Significantly, none of the Individual Defendants have taken remedial action to redress the conduct alleged herein. For instance, none of the Company's current directors have sought to enforce Rocket's Clawback Guidance, which provides:

> If the Company must prepare an accounting restatement due to the material noncompliance of the Company with any financial reporting requirements under the securities laws, the Company may seek recovery of any erroneously awarded incentive-based compensation (i.e., the amount of incentive-based compensation received that exceeds the amount of incentive-based compensation that otherwise would have been received had it been determined based on the accounting restatement, computed without regard to any taxes paid).= received during the three completed fiscal years immediately preceding the date the Company is required to prepare such restatement and any transition period resulting fiscal years by executive officers who served at any time during the performance period for such incentive-based compensation. These remedies would be in addition to, and not in lieu of, any actions imposed by law enforcement agencies, regulators or other authorities.

151.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of fiduciary duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

152.    The acts complained of herein constitute violations of fiduciary duties owed by Rocket's officers and directors, and these acts are incapable of ratification.

153.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e*., monies belonging to the stockholders of Rocket. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Rocket, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

154.    If there is no directors' and officers' liability insurance, then the directors will not cause Rocket to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

155.    Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

156.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

157.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

158.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements in the Registration Statement specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

159.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

160.    The Individual Defendants acted with scienter because they: (i) knew that the Registration Statement issued and disseminated in the name of Rocket was materially false and misleading; (ii) knew that the Registration Statement would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of the materially false and misleading statements in the Registration Statement as primary violations of the securities laws.

161.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Rocket, their control over, and/or receipt and/or modification of Rocket's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Rocket, participated in the fraudulent scheme alleged herein.

162.     As a result of the foregoing, the price of Rocket common stock issued in the IPO was artificially inflated. In ignorance of the falsity of the statements, Plaintiff relied on the representations in the Registration Statement described above in purchasing Rocket common stock at a price that was artificially inflated as a result of these false and misleading statements and were damaged thereby.

163.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against the Individual Defendants for
### Breach of Fiduciary Duty

164.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

165.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

166.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

167.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be

disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

169.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

170.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## COUNT III

### Against Defendant Daniel Gilbert for
### Breach of Fiduciary Duty (*Brophy* Claim)

171.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

172.    During the Relevant Period, Defendant Daniel Gilbert held a position with the Company that provided him access to confidential, propriety information concerning the Company's financial condition and future business prospects. Notwithstanding his duty to refrain from trading in Rocket's common stock under the circumstances, Defendant Daniel Gilbert sold his holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

173.   The insider sale detailed herein was not part of any regular pattern of sales for Defendant Daniel Gilbert and was suspicious in terms of timing and amount.

174.   The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendant Daniel Gilbert misappropriated for his own benefit when he sold Rocket stock. At the time of his stock sales, Defendant Daniel Gilbert was aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's stock to significantly decrease. Defendant Daniel Gilbert's sales of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

175.   Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

176.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

177.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

178.   Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants for Waste of Corporate Assets**

179.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

180.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

181.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Action.

182.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

183.    Plaintiff, on behalf Rocket, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Rocket and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the Company damages in an amount to be determined at trial as a result of the Individual Defendants' violation of securities law, breaches of fiduciary duties and waste of corporate assets;

C.    Directing Rocket to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Rocket and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.      Awarding to Rocket restitution from the Individual Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  May 22, 2023                          **Respectfully submitted,**

                                                    **ANTHONY L. DELUCA, PLC**
                                                    */s/ Anthony L. DeLuca*
                                                    Anthony L. DeLuca (P64874)
                                                    14950 East Jefferson Avenue, Ste 170
                                                    Grosse Pointe Park, MI 48230
                                                    (313) 821-5905
                                                    anthony@aldplc.com

                                                    **RIGRODSKY LAW, P.A.**
                                                    Seth D. Rigrodsky
                                                    Gina M. Serra
                                                    Timothy J. MacFall
                                                    825 East Gate Blvd., Suite 300
                                                    Garden City, NY 11530
                                                    (516) 683-3516

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*